## EXHIBIT A

## AFFIDAVIT IN SUPPORT OF FORFEITURE

I, Jennifer W. Joiner, being first duly sworn, state as follows:

1.     I make this affidavit to establish probable cause in support of a Verified Complaint for Forfeiture in Rem for the following real property: Defendant Real Property located at **1010 W. Garden Street in Pensacola, Escambia County, Florida**, Property Tax ID # 000S009080190052, titled in the names of John M. Thomas and Shana S. Thomas, more particularly described as:

> **Lot Nineteen (19) and West half (W1/2) of Lot Twenty (20), in Block Fifty Two (52), of The Maxent Tract, according to map of said City copyrighted by Thomas C. Watson in 1906, said property having a frontage of 45 feet on the North side of Garden Street by a depth of 125 feet, Escambia County, Florida.**

2.     Based on the sealed complaint dated March 12, 2021, and the facts set forth in this affidavit, I respectfully submit that the Defendant Real Property is subject to forfeiture to the United States pursuant to Title 18, United States Code, Sections 981(a)(1)(A), 981(a)(1)(C), and 981(a)(1)(D) (relating to civil forfeiture), and 982(a)(2) (relating to criminal forfeiture, as property involved in transactions or that constitutes proceeds or is derived from proceeds traceable to violations of Title 18, United States Code, Sections 1343 (Wire Fraud), 1956(a)(1) (Money Laundering), and 1957 (Money Laundering Involving Financial Transactions Exceeding $10,000).

1

3.     I have been a Special Agent ("SA") with the FBI since 2005. I am currently assigned to a squad responsible for conducting investigations which typically pertain to violations of Title 18 of the United States Code, including, but not limited to, complex financial fraud, bank fraud, mail fraud and wire fraud violations and other white-collar crime matters.  I have a master's degree in taxation and have been a Certified Public Accountant since 2001.  In my tenure with the FBI, I have participated in the execution of search warrants and arrest warrants and have conducted investigations in the areas of corporate fraud, financial institution fraud, wire and mail fraud, as well as other white-collar crime matters.  During these and other investigations I have conducted or participated in physical and electronic surveillance, debriefed informants, and reviewed pertinent records.  Through my training, education, and experience, I have become familiar generally with the efforts of persons involved in criminal activity to avoid detection by law enforcement.

4.     I am familiar with the facts and circumstances surrounding this investigation, both from my own investigative activities and from information obtained from law enforcement officers and others with personal knowledge of the facts.  I have not included all facts known to me concerning this investigation, but rather only those facts necessary to establish support for forfeiture of the Defendant Real Property.

5.     On March 12, 2021, I obtained a criminal complaint in the Northern District of Florida charging JOHN THOMAS ("THOMAS") with wire fraud in violation of Title 18 U.S.C. § 1343.   See 3:21mj91/EMT.

6.     The following is a summary of the facts underlying the complaint. It alleges that THOMAS operated an insurance business known as THOMAS INSURANCE LLC, and through this business, THOMAS defrauded customers through a common type of insurance fraud known as premium diversion. THOMAS executed this scheme by collecting insurance premiums from customers and keeping the funds for personal use instead of producing insurance policies. THOMAS gave the customers fraudulent documents referencing insurance policies that did not exist.

## INVESTIGATION

7.     On January 5, 2021, I interviewed the President and Chief Executive Officer (CEO) (hereinafter referred to as "Executives") of a family-owned manufacturing business (hereinafter referred to as "Victim Company #1") located in Pensacola, Florida.  The Executives advised that Victim Company #1 had been the victim of an insurance fraud scheme perpetrated by THOMAS, owner and operator of THOMAS INSURANCE, LLC (hereinafter referred to as THOMAS INSURANCE).

8.     According to the Executives, they began using THOMAS INSURANCE for all their insurance products in or around September 2013.  Since that time, Victim Company #1 has paid approximately $600,000 in insurance premiums to THOMAS INSURANCE but has recently learned THOMAS did not purchase many of the insurance policies for Victim Company #1 and instead produced fraudulent Certificates of Insurance (COAs) that THOMAS provided to Victim Company #1 via email.  Victim Company #1 believed it had purchased general liability, business automobile, business property, product liability, director and officer, employment practices liability, and flood insurance products from THOMAS INSURANCE.

9.     In December 2020, the Executives began hearing rumors from friends that something was going on with THOMAS INSURANCE.  Two friends of the CEO of Victim Company #1 independently told him there had been an issue with one of THOMAS INSURANCE's clients, a hotel located in Pensacola Beach, Florida.  The hotel had suffered damage due to a fire, and when the hotel filed an insurance claim, THOMAS INSURANCE had to write a check for approximately $900,000 to settle the claim because there was no insurance policy in effect to pay the claim.  Had THOMAS INSURANCE purchased the insurance policy with the premium paid, the insurance company would have written the check to settle the claim instead of THOMAS INSURANCE.

4

10.     As a result of this information, the Executives became concerned about whether Victim Company #1 in fact held the insurance policies that it had paid premiums for obtaining.  The Executives began contacting the insurance companies directly to verify the policies listed on the COAs THOMAS had provided.

11.     The Executives contacted the insurance company listed on the COA THOMAS provided for the Directors and Officers insurance policy.  The insurance company representative told the Executives the policy number does not exist.  In fact, the policy number listed by THOMAS was invalid based on the number of digits it contained.  The representative from the insurance company was able to identify the insured business after the extra digit was removed, and the policy belonged to a cinema located in Gulf Breeze, Florida.  Victim Company #1 paid approximately $6,600 in premiums for this policy between 2013 and 2020.

12.     According to the Executives, when they contacted the insurance company listed on their COA for Victim Company #1's business property insurance, the company advised they were unable to locate any policy in Victim Company #1's name.  The policy number THOMAS had listed on the COA appeared to match a quote number from 2013 when THOMAS originally received the quote for the policy.  Between 2015 and 2020, Victim Company #1 paid THOMAS INSURANCE approximately $269,000 in premiums for this policy.

13.    Victim Company #1 contacted the insurance company listed on the THOMAS INSURACE COAs for their general liability and umbrella liability insurance policies.  The representative from the insurance company indicated the policy number listed also matched the same cinema located in Gulf Breeze, Florida.  Victim Company #1 paid THOMAS INSURANCE approximately $186,000 for insurance premiums related to these policies between 2014 and 2020.

14.    When Victim Company #1 contacted the insurance company listed on its EPLI COA, the representative from the company stated the policy number provided by THOMAS was issued to a different company that is unrelated to Victim Company #1.  Between 2014 and 2020, Victim Company #1 paid THOMAS INSURANCE approximately $28,000 for the EPLI insurance premiums.

15.    Based on the information provided by Victim Company #1, I initiated an investigation of THOMAS INSURANCE in January 2021.  I performed a search on the website for the Division of Corporations for the State of Florida (www.sunbiz.org) and located the filing information for THOMAS INSURANCE LLC.  The Articles of Incorporation for the LLC were filed on or about May 28, 2004, and listed THOMAS as the registered agent and managing member.  As of May 2, 2021, THOMAS INSURANCE still displayed as an active entity with a principal address of **1010 W. Garden Street, Pensacola, Florida.**

16.     In furtherance of the investigation, to date, I have interviewed several customers of THOMAS INSURANCE to include businesses who purchased commercial policies, as well as individuals who purchased homeowner's and flood insurance policies on their personal residences. The investigation has identified numerous victims of the fraud who have all described how they paid insurance premiums to THOMAS INSURANCE, but later learned the documents provided to them by THOMAS were fraudulent. Some of the businesses and individuals have suffered additional damages due to unpaid insurance claims because of the fraud.

17.     One of the victims, hereinafter referred to as Victim Company #2, is a real estate rental company located in Pensacola Beach, Florida. Victim Company #2 owns a commercial business property, several condominium rental properties and a bike rental business. I interviewed the owners of Victim Company #2 on February 12, 2021. Victim Company #2 began using THOMAS INSURANCE for the property and flood insurance policies on all the victim's properties in either 2004 or 2005 after Hurricane Ivan. Based on my investigation to date, Victim Company #2 has paid over $100,000 in premiums to THOMAS INSURANCE between 2014 and 2020.

18.     After Hurricane Sally, which made landfall near Gulf Shores, Alabama, on September 16, 2020, Victim Company #2 suffered significant damage

to two of the properties that were insured by THOMAS INSURANCE. Shortly after the storm, the owner of Victim Company #2 contacted THOMAS about filing claims for the damage to the properties. When THOMAS came out to assess the damage, he told the owner the damage was not significant enough to exceed the deductibles on the policies.

19.    After meeting with THOMAS, the owner of Victim Company #2 began gathering estimates for the damage. The damage to one building, a condominium, included damage to the exterior walls and to the balconies and rails. Due to the structural nature of the damage, Victim Company #2 has not been able to rent the condos to customers since the hurricane. Victim Company #2's office building also suffered damage from Hurricane Sally. The building's roof was damaged, which resulted in water damage inside the building. In addition, the exterior balcony on the second floor of the property was damaged, and the owners had to use caution tape to keep people off the balcony and to prevent people from walking under the balcony.

20.    According to the owner of Victim Company #2, the estimates for the repairs for the condominium building damaged by the hurricane exceed $850,000. The owners have not yet been able to get estimates for the damage to Victim Company #2's office building. The owners have been sending THOMAS the estimates via email for the repairs as they are received, and THOMAS indicated

he was sending the estimates to the insurance carrier, but the owner never heard anything about how the claim would be settled.

21.    The owners of Victim Company #2 became concerned when THOMAS grew increasingly unresponsive to the owners' requests about filing insurance claims related to the hurricane. In February 2021, the owners of Victim Company #2 contacted the insurance carriers directly regarding the policies purchased through THOMAS INSURANCE and were told the policies they purchased did not exist for the two properties described above. As a result, the owners have no insurance coverage for the hurricane damage to the properties that they anticipate will exceed $1 million.

22.    On February 8, 2021, I interviewed another victim hereinafter referred to as Victim #3 who is an attorney in Pensacola, Florida.  Victim #3 owns a commercial warehouse building in Pensacola as well as the building in which Victim #3 operates a law office. Victim #3 has used THOMAS INSURANCE for the commercial property insurance policies for both buildings for approximately seven years. Based on my investigation to date, Victim #3 has paid over $70,000 in insurance premiums to THOMAS INSURANCE between 2014 and 2020.

23.    As a result of Hurricane Sally, Victim #3 suffered damage to the victim's law office building, including roof damage, interior water damage, and damage to the building's awnings. Victim #3 contacted THOMAS regarding the

damage to the office building, and THOMAS came to the building to "self-adjust" the damage. THOMAS agreed the building needed a new roof and told the victim he would initiate the claim. Based on THOMAS' instructions, Victim #3 found a contractor to replace the roof and provided the estimate to THOMAS.

24. By February 2021 when the contractor had begun replacing the roof, Victim #3 had grown concerned by THOMAS' lack of responsiveness on the claim. Victim #3 contacted another insurance agent for advice, and after reviewing the documents THOMAS had provided to the victim, the agent told the victim the policy documents did not appear to be legitimate. Victim #3 then contacted the insurance carriers directly and determined both commercial property policies were fraudulent. As a result, Victim #3 estimates the damages to the office building of approximately $150,000 will not be covered.

25. On February 1, 2021, I interviewed a dermatologist surgeon (hereinafter referred to as Victim #4) who provides services in Pensacola, Florida. Victim #4 has been using THOMAS INSURANCE for the commercial general liability and property insurance policies for Victim #4's surgery practice since 2005.

26. In January 2021, Victim #4 was complaining to a friend about the difficulty the victim was having when attempting to get in touch with the victim's insurance agent. Once the friend heard THOMAS was the victim's insurance

10

agent, the friend encouraged Victim #4 to look closer at the policies purchased through THOMAS INSURANCE because there were rumors of insurance fraud related to the business. Victim #4 contacted THOMAS and asked THOMAS to provide his policy information because THOMAS had failed to provide it when Victim #4 had previously requested it.

27.     When THOMAS did send Victim #4 an evidence of insurance document via e-mail, the victim sent the information provided by THOMAS to another insurance agent to verify. The new insurance agent was able to verify the general liability and property insurance policies Victim #4 had paid for were fake. In fact, the agent noted the policy document THOMAS provided to Victim #4 referenced a different THOMAS INSURANCE customer in the document. Victim #4 paid THOMAS INSURANCE over $200,000 for the general liability and property insurance policies between November 2013 and October 2019.

28.     On January 19, 2021, I interviewed the Chief Financial Officer (CFO) of Victim Company #5 which is a privately held commercial real estate firm that acquires properties such as multi-family tenant properties (apartments) and hotel properties across the United States. Victim Company #5 began using THOMAS INSURANCE around 2012 for the company's property and flood insurance policies for the properties the company owns in the Pensacola area and surrounding region.

11

29.     In May 2020, there was a fire at one of Victim Company #5's properties in Mobile, Alabama, and the company filed an insurance claim through THOMAS. When the claim settlement process began dragging on without a resolution, Victim Company #5 asked a Dallas, Texas based insurance company, which handles some of the company's other insurance policies, to investigate the policy managed by THOMAS INSURANCE. The Dallas based insurance company determined the policy purchased through THOMAS INSURANCE was fraudulent, so they began reviewing all the insurance policies purchased through THOMAS INSURANCE. Based on their research, they determined the majority, if not all, of the insurance policies did not exist.

30.     In or around August 25, 2020, Victim Company #5 received a check directly from THOMAS INSURANCE of approximately $481,000 to settle part of the fire claim. In or around September 9, 2020, Victim Company #5 received a second check from THOMAS INSURANCE of approximately $409,000, but this second check was rejected by the bank. On or about September 22, 2020, Victim Company #5's CFO travelled to Pensacola to meet in person with THOMAS. The CFO confronted THOMAS about what he had learned about the fraudulent insurance policies and THOMAS admitted to the fraud. THOMAS told the CFO that Victim Company #5 was the only customer he defrauded. The CFO agreed to try to settle the matter with THOMAS privately, and THOMAS gave the CFO a

12

cashier's check on that day for approximately $435,000 to cover the outstanding portion of the claim from the check that had bounced.

31.     Victim Company #5 provided the FBI with a spreadsheet detailing the insurance policies purchased through THOMAS INSURANCE on the various properties owned by the company. According to this spreadsheet, the insurance premiums paid to THOMAS INSURANCE by Victim Company #5 between 2012 and 2021 exceeded $3 million.

32.     On February 5, 2021, I interviewed THOMAS' wife, SHANA THOMAS (hereinafter referred to as SHANA). According to SHANA, in either September or October 2020, THOMAS moved to a residence located at 2001 High Street in Park City, Utah which is a vacation home purchased by THOMAS and SHANA in the summer of 2020. SHANA could not explain what prompted THOMAS to move to Utah, but she denied any knowledge that THOMAS moved due to problems with THOMAS INSURANCE.

33.     SHANA advised during her interview that beginning on or around January 28, 2021, she started receiving calls from friends who were customers of THOMAS INSURANCE. The customers were complaining to SHANA because they had learned the insurance policies they purchased from THOMAS were fraudulent. Even though SHANA has a 50% ownership interest in THOMAS INSURANCE, she denied any knowledge of fraud at the company. According to

SHANA, THOMAS handled all the financial records at THOMAS INSURANCE as well as the financial matters for their family.

## Bank Accounts

34.    On April 25, 2016, THOMAS opened a ServisFirst Bank checking account with the last four digits 6367.   Both JOHN THOMAS and SHANA THOMAS are signers on the account, and the account owner name and address were listed as follows:

> Thomas Insurance, LLC
> 1010 W. Garden St.
> Pensacola, FL  32502

35.    On May 29, 2013, THOMAS opened a BBVA Compass Bank Business Choice checking account with the last four digits 6790.   Both JOHN THOMAS and SHANA THOMAS are signers on the account, and the account owner name and address were listed as follows:

> Thomas Insurance, LLC
> 1010 W Garden St.
> Pensacola, FL 32501

36.    On January 26, 2010, THOMAS opened a Gulf Coast Community Bank (GCCB) account with the last four digits 1782.  Both JOHN THOMAS and SHANA THOMAS are signers on the account, and the account owner name and address were listed as follows:

Thomas Insurance
1010 W Garden St.
Pensacola, FL 32502-4623

37.    On March 29, 2017, THOMAS opened a Synovus Bank account with the last four digits 4513.  Both JOHN THOMAS and SHANA THOMAS are signers on the account, and the account owner name and address were listed as follows:

Thomas Insurance, LLC
1010 W Garden St.
Pensacola, FL 32502

### Defendant Real Property

38.    Records obtained from the Escambia County Property Appraiser's website reveal that on or about April 30, 2008, JOHN and SHANA THOMAS purchased the Defendant Real Property located at **1010 W. Garden Street in Pensacola, Florida** for approximately $250,000.

39.    Records obtained through a public record search of Escambia County's Official Records showed this property was purchased through two mortgages, one for $40,000 with Advance Management, Inc., and another mortgage for $212,250 with Compass Bank.  Official records from Escambia County also show the mortgage with Advance Management, Inc. was satisfied on or about April 13, 2012, and the mortgage with Compass Bank was satisfied on or

about July 22, 2016, after the loan was refinanced through ServisFirst Bank as described in paragraph 41.

40.     Bank records for the entire period of the loans described above are not available due to the document retention policies of the financial institutions. However, a review of the available bank records from Compass Bank identified 28 payments of $1,675.49 between January 1, 2014 and May 31, 2016 totaling $46,913.72.   These payments were made from the THOMAS INSURANCE checking account at Compass Bank ending in 6790 and made payable to the Compass Bank loan ending in 2345.  The same Compass Bank loan ending in 2345 was paid off with a check in the amount of $159,540.21 from a closing attorney on or about May 31, 2016 when the loan was refinanced.

41.     On or about May 27, 2016, JOHN and SHANA THOMAS signed a commercial mortgage agreement with ServisFirst Bank in the amount of $160,000 for the property located at **1010 W. Garden Street in Pensacola, Florida.** According to ServisFirst Bank, the balance on this mortgage was approximately $73,218.93 as of February 2, 2021.

42.     Between May 27, 2016 and February 2, 2021, payments on the commercial mortgage with ServisFirst described above were made from the following accounts:

| Account | Number of Payments | Total Amount of Payments |
|---|---|---|
| GCCB - 1782 | 9 | $17,763.21 |
| ServisFirst - 6367 | 5 | $9,868.45 |
| Synovus - 4513 | 42 | $82,894.98 |
| Total | 56 | $110,526.64 |

43.    A review of bank records from the ServisFirst Bank account ending in 6367 in the name of Thomas Insurance identified three checks payable to a local masonry contractor totaling $92,899 between July and September 2017. According to the local masonry contractor, during those three months of 2017 he performed various brick and paver work for THOMAS INSURANCE at the business office located at **1010 West Garden Street, Pensacola, Florida** including the installation of a paver driveway, a brick skirt on the building, a brick privacy wall in the rear parking lot, brick steps and brickwork around the business sign.

44.    On or about May 4, 2020, THOMAS signed a Notice of Commencement form in Escambia County for a local metal roofing company to perform work at **1010 West Garden Street, Pensacola, Florida.** Records from Synovus Bank show two checks written from the Thomas Insurance account ending in 4513 made payable to the local metal roofing company. The first check is dated April 29, 2020, in the amount of $12,400, and the second check is dated

May 20, 2020, also in the amount of $12,400.  Records from the local metal roofing company confirm these two payments totaling $24,800 were to install a metal roof on the building located at **1010 West Garden Street, Pensacola, Florida.**

45.     I have conducted a preliminary review of the bank records for the THOMAS INSURANCE LLC checking accounts including the ServisFirst account ending in 6367, the Compass Bank account ending in 6790, the GCCB account ending in 1782, and the Synovus account ending in 4513.  The bank records show that checks from customers of THOMAS INSURANCE were regularly deposited into these bank accounts including deposits for insurance premiums from all the victims described above.

46.     Between January 1, 2014 and May 31, 2016, I have identified deposits from the five victims described above into the Compass Bank checking account ending in 6790 as follows:

| Victim | Amount |
|--------|--------|
| 1 | $136,449.17 |
| 2 | $54,378.52 |
| 3 | $10,966.22 |
| 4 | $47,086.10 |
| 5 | $31,577.20 |
| Total | $280,457.21 |

47.     Between May 1, 2016, and January 31, 2021, I have identified deposits from the five victims described above into the other three accounts as follows:

| Victim | GCCB 1782 | ServisFirst 6367 | Synovus 4513 |
|---|---|---|---|
| 1 | $0 | $400,468.00 | $0 |
| 2 | $7,428.00 | $74,805.86 | $50,184.43 |
| 3 | $0 | $61,664.88 | $0 |
| 4 | $0 | $138,486.00 | $0 |
| 5 | $6,128.50 | $3,356,777.59 | $84,541.36 |
| **Total** | **$13,556.50** | **$4,032,202.33** | **$134,725.79** |

48.     Based on the transactions detailed above, at least $153,233.65 of the funds used to pay the mortgages on the Defendant Real Property originated from or were funded by the accounts where THOMAS deposited checks from the victims as shown in the chart below:

| Payments From | Compass Loan | ServisFirst Loan | Victim Deposits | Funded by Victims |
|---|---|---|---|---|
| Compass - 6790 | $46,913.72 | | $280,457.21 | $46,913.72 |
| GCCB - 1782 | | $17,763.21 | $13,556.50 | $13,556.50 |
| ServisFirst - 6397 | | $9,868.45 | $4,032,202.33 | $9,868.45 |
| Synovus - 4513 | | $82,894.98 | $134,725.79 | $82,894.98 |
| Totals | $46,913.72 | $110,526.64 | $4,460,941.83 | **$153,233.65** |

49.     An additional $117,699.00 of funds used to maintain or improve the Defendant Real Property also originated from or were funded by accounts where THOMAS deposited checks from the victims as shown in the following chart:

| Payments From | Masonry | Metal Roof | Victim Deposits | Funded by Victims |
|---|---|---|---|---|
| ServisFirst - 6397 | $92,899.00 | | $4,032,202.33 | $92,899.00 |
| Synovus - 4513 | | $24,800.00 | $134,725.79 | $24,800.00 |
| Totals | $92,899.00 | $24,800.00 | $4,166,928.12 | **$117,699.00** |

50.      Since the Defendant Real Property was purchased with or improved with at least $270,932.65 in proceeds from a violation of 18 U.S.C. Section 1343 (wire fraud), the real property is subject to forfeiture as proceeds of the wire fraud violations, pursuant to Title 18, United States Code, Section 981(a)(1)(D).  The wire transfers detailed above violated Title 18, United States Code, Section 1957(a) because the payments involved monetary transactions conducted with more than $10,000 in criminally derived funds and, as such, the entire real property is subject to forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(A), 981(a)(1)(C), and 981(a)(1)(D).

## STATUTES

51.      Under 18 U.S.C. § 1343, "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire . . . communication in interstate or

foreign commerce . . . for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than twenty years, or both."

52.     Title 18, United States Code, Section 1956 provides that whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—and knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity…shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than 20 years, or both.

53.     Title 18, United States Code, Section 1957 provides that "whoever ... knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity, shall be punished by fine or imprisonment for not more than ten years or both."

54.     Title 18, United States Code, Section 981(a)(1)(A) provides that "any property, real or personal, involved in a transaction in violation of section 1956, 1957 ... or any property traceable to such property is subject to forfeiture."

55.     Title 18, United States Code, Section 981(a)(1)(C) provides that any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of…any offense constituting "specified unlawful activity" (as defined in section 1956(c)(7) of this title, or a conspiracy to commit such offense, is subject to forfeiture.

56.     Title 18, United States Code, Section 1956(c)(7) establishes that the term "specified unlawful activity" means – "(A) any act of activity constituting an offense listed in section 1961(1) of this title…"

57.     Title 18, United States Code, Section 1961(1) sets forth numerous offenses including section 1343 (relating to wire fraud).

58.     Title 18, United States Code, Section 981(a)(1)(A) provides for the civil forfeiture of any property, real or personal, involved in a transaction in violation of section 1956 and 1957, or traceable to such property. Title 18, United States Code, Section 981(a)(1)(C) provides that any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of … any offense constituting "specified unlawful activity" (here, Section 1343 relating to wire fraud) is subject to civil forfeiture. Title 18, United States Code, Section 981(a)(1)(D)(vi), provides that [a]ny property, real or personal, which represents or is traceable to the gross receipts obtained, directly or indirectly, from a violation of . . . section 1343 (relating to wire fraud)" is subject to civil forfeiture.

## **CONCLUSION**

59.    Based on the information herein, I respectfully submit that there is probable cause to believe that the property described in this affidavit constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the federal wire fraud offenses alleged in the criminal complaint. Accordingly, I respectfully request that the Court issue a warrant to seize the property.

Respectfully submitted,

JENNIFER W. JOINER
Special Agent
Federal Bureau of Investigation

STATE OF FLORIDA
COUNTY OF ESCAMBIA

Subscribed and sworn to before me on this 18th day of May 2021, in Pensacola, Florida, in that the above affiant attested to and submitted the contents of the foregoing written affidavit via reliable electronic means.

NOTARY PUBLIC

My Commission Expires: 4/30/2022

NILSA N. CLARKE
Commission # GG 212885
Expires April 30, 2022
Bonded Thru Troy Fain Insurance 800-385-7019